LITTLER MENDELSON, P.C.
Michael P. Pappas (MP-6716)
885 Third Avenue
New York, New York  10022
(212) 583-9600

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MICHAEL WEINBERG,

                Plaintiff,

          -against-

FIDELITY BROKERAGE SERVICES, LLC;
FIDELITY INVESTMENTS; and  EDWARD T.
MONACO in his official and individual capacities,

                Defendants.
_____

06-CV-0628 (LAK)

**DEFENDANTS' LOCAL CIVIL RULE
56.1 STATEMENT OF FACTS NOT IN
DISPUTE**

       Defendant Fidelity Brokerage Services, LLC ("Fidelity"), improperly-named defendant

Fidelity Investments,[1] and individually-named defendant Edward T. Monaco, by and through

their attorneys, Littler Mendelson, P.C., hereby state the following facts as to which there is no

genuine issue to be tried:[2]

       1.     Plaintiff lied on his employment application to Fidelity.  (Deposition of Michael

Weinberg dated June 21 and July 7, 2006 ("Weinberg Dep.") at 12:8-22, 15:15 – 17:9.)[3]

---

[1]    Fidelity Investments is a service mark under which Fidelity Brokerage Services, LLC, and certain
of its affiliates, operate.  It is not a legal entity and, therefore, not a properly named defendant in this case.

[2]    The facts set forth herein are undisputed for purposes of Defendants' motion for summary
judgment only, and are not admissions or stipulations of fact with respect to any other part of this action.

[3]    Deposition excerpts and exhibits cited herein are attached to the Declaration of Michael P. Pappas
dated November 3, 2006 ("Pappas Dec.").  Other declarations and exhibits thereto cited herein are
submitted separately herewith.

2.     Plaintiff provided false information on the resume he submitted to Fidelity. (Weinberg Dep. at 12:8-22, 15:15 – 17:9, 18:9-17.)

3.     Plaintiff was employed in Fidelity's Rockefeller Center branch from January 2, 2001, through January 6, 2006.  (Weinberg Dep. at 32:17-23, 524:22-24.)

4.     During Plaintiff's employment at Fidelity he held the position of Financial Representative II ("FR2"), the title of which was changed to Investments Representative some time during Plaintiff's employment.  (Weinberg Dep. at 32:24 – 33:11, 44:12-14.)

5.     Plaintiff's duties and responsibilities as an FR2 in the Rockefeller Center branch were as described in Exhibits 4 and 5 to Plaintiff's deposition.  (Weinberg Dep. at 42:4 – 44:11, Exhs. 4, 5.)

6.     From the date of Plaintiff's hire through December 2002, Plaintiff's direct supervisor was Christopher ("Chris") Hodges, the Branch Manager of the Rockefeller Center branch.  (Weinberg Dep. at 54:4-24.)

7.     Chris Hodges never discriminated against Plaintiff because of Plaintiff's religion. (Weinberg Dep. at 56:2-7, 76:20 – 77:8, 85:3-9.)

8.     Chris Hodges prepared and provided Plaintiff with the performance assessment marked and identified as Exhibit 11 to Plaintiff's deposition.  (Weinberg Dep. at 61:21 – 62:13, Exh. 11.)

9.     The criticisms of Plaintiff's job performance made by Chris Hodges in the performance assessment marked and identified as Exhibit 11 to Plaintiff's deposition were not motivated by Plaintiff's religion. (Weinberg Dep. at 77:4-8, Exh. 11.)

10.     Plaintiff did not apply for a promotion to Financial Representative III ("FR3") during the time Chris Hodges was Branch Manager of the Rockefeller Center branch. (Weinberg Dep. at 188:13-15, 194:17-20.)

11.     In January 2003, Edward ("Ed") Monaco became Branch Manager of the Rockefeller Center branch. (Weinberg Dep. at 54:22 – 55:5, 195:5-7.)

12.     From January 2003 through the end of Plaintiff's employment with Fidelity, Plaintiff's direct supervisor was Ed Monaco. (Weinberg Dep. at 55:22-25.)

13.     Immediately prior to becoming Branch Manager of the Rockefeller Center Branch in January 2003, Ed Monaco was Branch Manager of Fidelity's Washington, D.C., branch (the "D.C. branch"). (Deposition of Edward T. Monaco dated August 25 and October 17, 2006 ("Monaco Dep.") at 71:21 – 72:3.)

14.     When Ed Monaco was Branch Manager of the D.C. branch, he hired Wendy Liebowitz as a financial representative trainee in June 2001. (Declaration of Wendy Liebowitz dated October 31, 2006 ("Liebowitz Dec."), ¶ 2.)

15.     Wendy Liebowitz is Jewish. (Liebowitz Dec., ¶ 1.)

16.     In June 2002, Ed Monaco promoted Wendy Liebowitz to Financial Representative I. (Liebowitz Dec., ¶ 2.)

17.     When Ed Monaco left the D.C. branch in 2003, Wendy Liebowitz wrote to him expressing thanks for his professional support and friendship, stating, inter alia: "I just wanted to say thank you for everything you have done for me in the past two years…. I am also very grateful for the feedback, training, emotional support, promotion to FR1, and generosity you have given to me…. You truly have been an amazing manager, but most of all you have been a great friend to every person that works with you." (Liebowitz Dec., ¶ 3, Exh. A.)

3

18.     Ed Monaco acted, and continues to act, as a professional mentor to Wendy Liebowitz. (Liebowitz Dec., ¶ 4.)

19.     Ed Monaco submitted a recommendation on Wendy Liebowitz's behalf for her promotion to an Assistant Branch Manager position at Fidelity. (Liebowitz Dec., ¶ 4.)

20.     Ed Monaco submitted a recommendation on Wendy Liebowitz's behalf for her admission into a part-time MBA program. (Liebowitz Dec., ¶ 4.)

21.     Wendy Liebowitz thinks very highly of Ed Monaco as a manager and as a person, and she never felt harassed, mistreated, or discriminated against by him because of her religion. (Liebowitz Dec., ¶¶ 3-6.)

22.     David Lubitz worked for Ed Monaco as a financial representative during Monaco's entire tenure in the D.C. branch. (Declaration of David Lubitz dated October 31, 2006 ("Lubitz Dec."), ¶¶ 2-3.)

23.     David Lubitz is Jewish. (Lubitz Dec., ¶ 1.)

24.     Ed Monaco acted, and continues to act, as a professional mentor to David Lubitz. (Lubitz Dec., ¶ 4.)

25.     Ed Monaco submitted a recommendation on David Lubitz's behalf for promotion to an Assistant Branch Manager position at Fidelity. (Lubitz Dec., ¶ 4.)

26.     Ed Monaco was instrumental in helping David Lubitz obtain a promotion to Vice President/Senior Account Representative at Fidelity by personally recommending him to the hiring manager. (Lubitz Dec., ¶ 4.)

27.     David Lubitz thinks very highly of Ed Monaco as a manager and as a person, and he never felt harassed, mistreated, or discriminated against by him because of his religion. (Lubitz Dec., ¶¶ 3-6.)

28.     As manager of the D.C. branch, Ed Monaco promoted Stan Zelman from Financial Representative III to Branch Account Executive. (Monaco Dep. at 75:8 – 76:4.)

29.     Stan Zelman is Jewish. (Monaco Dep. at 72:12-22.)

30.     Rochelle Karey-Rokaw was a customer service representative in Fidelity's D.C. branch during Ed Monaco's tenure as Branch Manager. (Declaration of Rochelle Karey-Rokaw dated October 31, 2006 ("Karey-Rokaw Dec."), ¶ 2.)

31.     Rochelle Karey-Rokaw is Jewish. (Karey-Rokaw Dec., ¶ 1.)

32.     Rochelle Karey-Rokaw had an excellent professional relationship with Ed Monaco, and he has provided her with employment recommendations since leaving the D.C. branch. (Karey-Rokaw Dec., ¶¶ 2-3.)

33.     Rochelle Karey-Rokaw thinks very highly of Ed Monaco as a manager and as a person, and she never felt harassed, mistreated, or discriminated against by him because of her religion. (Karey-Rokaw Dec., ¶¶ 2-4.)

34.     In 2002, Ed Monaco's supervisor commended him on his management of the D.C. branch employees, and specifically noted the following in Monaco's performance assessment: "Strong contributions from Dave Lubitz"; "Good work done by Ed in developing FRT Liebowitz"; "Additionally good work done by Ed in motivating and keeping part of the team the BAE, Zelman"; "The empowerment of Lubitz to lead the branch was a great call!". (Declaration of Edward T. Monaco dated November 6, 2006 ("Monaco Dec."), ¶ 5, Exh. 1.)

35.     With the exception of Plaintiff, Jewish employees who have known and worked with Ed Monaco over the years strongly believe he is not anti-Semitic. (Liebowitz Dec., ¶¶ 5-6; Lubitz Dec., ¶¶ 5-6; Karey-Rokaw Dec., ¶¶ 3-4; Declaration of Nancy Sherr Rizzo dated

November 1, 2006 ("Sherr Rizzo Dec."), ¶¶ 3-4; Declaration of Richard Rosenthal dated November 1, 2006 ("Rosenthal Dec."), ¶¶ 4-5.)

36.     On or about October 15, 2003, Ed Monaco provided Plaintiff a written performance assessment for the period encompassing the first half of 2003, which assessment was marked and identified as Exhibit 14 to Plaintiff's deposition. (Weinberg Dep. at 96:4 – 97:6, Exh. 14.)

37.     Plaintiff agreed with the overall rating of his performance given by Ed Monaco in Plaintiff's written performance assessment for the period encompassing the first half of 2003. (Weinberg Dep. at 98:9-14, Exh. 14.)

38.     In Plaintiff's written performance assessment for the period encompassing the first half of 2003, Ed Monaco wrote that he would like to see Plaintiff take on an even bigger role in the branch. (Weinberg Dep. at 108:21-25, Exh. 14.)

39.     On or about February 24, 2005, Ed Monaco provided Plaintiff a written performance assessment for the period encompassing the second half of 2004, which assessment was marked and identified as Exhibit 18 to Plaintiff's deposition. (Weinberg Dep. at 141:16 – 142:4, Exh. 18.)

40.     In or about August 2005, Ed Monaco provided Plaintiff a written performance assessment for the period encompassing the first half of 2005, which assessment was marked and identified as Exhibit 19 to Plaintiff's deposition. (Weinberg Dep. at 157:20 – 159:10, Exh. 19.)

41.     Written performance assessments for the second half of a particular year were typically given in February or March of the following year. (Weinberg Dep. at 164:16-21.)

42.     Plaintiff did not receive a written performance assessment for the second half of 2005 because he resigned on January 6, 2006. (Weinberg Dep. at 164:25 – 165:10.)

43.     Plaintiff received written performance assessments with the same frequency as his FR2 peers in the Rockefeller Center branch.  (Monaco Dec., ¶ 16; Weinberg Dep. at 163:21 – 164:13.)

44.     The duties and responsibilities of an FR3 at the Rockefeller Center branch are as described in Exhibits 23 and 24 to Plaintiff's deposition.  (Weinberg Dep. at 175:11 – 177:4, Exhs. 23, 24.)

45.     FR3 vacancies were posted electronically by Fidelity, and Plaintiff could access them on-line.  (Weinberg Dep. at 182:18 – 184:2.)

46.     Plaintiff did not apply for a promotion to FR3 in 2003.  (Weinberg Dep. at 196:8-10.)

47.     Plaintiff does not recall ever expressing to Ed Monaco a desire to be promoted to FR3 in 2003. (Weinberg Dep. at 195:16 – 196:7.)

48.     Plaintiff did not apply for a promotion to FR3 in 2004.  (Weinberg Dep. at 197:13-15.)

49.     Plaintiff does not recall ever expressing to Ed Monaco a desire to be promoted to FR3 in 2004.  (Weinberg Dep. at 197:25 – 198:12.)

50.     Plaintiff did not apply for a promotion to FR3 prior to September 2005.  (Weinberg Dep. at 198:20 – 199:3.)

51.     In September 2005, there was an opening for an FR3 in the Rockefeller Center Branch.  (Weinberg Dep. at 199:4-7.)

52.     Ed Monaco told Plaintiff about the FR3 opening.  (Weinberg Dep. at 199:20-23, 200:20-25, Exh. 25.)

53.  If not for being notified by Ed Monaco, Plaintiff would have missed the deadline for applying for the FR3 opening.  (Weinberg Dep. at 202:9-23.)

54.  When Plaintiff had difficulty finding the electronic job posting for the FR3 opening, Ed Monaco obtained the job requisition number for him and gave him instructions for finding it on the corporate website.  As a result of Monaco's assistance, Plaintiff was able to apply for the promotion.  (Weinberg Dep. at 202:24 – 203:19, Exh. 25.)

55.  Plaintiff submitted an application for the FR3 position on September 27, 2005. (Weinberg Dep. at 203:13-19.)

56.  Plaintiff was interviewed for the FR3 position separately by: (i) Ed Monaco and Carl Chenet, the Assistant Branch Manager at Rockefeller Center; (ii) Jennifer Parkhurst, a Fidelity staffing specialist; and (iii) Ronald Medalla, the Branch Manager of Fidelity's Third Avenue branch.  (Weinberg Dep. at 203:25 – 205:10, 208:22 – 209:5.)

57.  Ronald Medalla was cordial to Plaintiff during the interview and wished him good luck.  (Weinberg Dep. at 208:11-18.)

58.  Plaintiff acted depressed, paranoid, and defensive during his interview with Jennifer Parkhurst.  (Weinberg Dep. at 211:22 – 213:25; Monaco Dec., ¶ 12, Exh. 5.)

59.  Jennifer Parkhurst was cordial to Plaintiff during the interview.  (Weinberg Dep. at 214:2-5.)

60.  Brian Burke, an FR2 in the Rockefeller Center branch, was also a candidate for the FR3 opening in September 2005.  (Weinberg Dep. at 216:18-22.)

61.  Brian Burke also interviewed separately with: (i) Ed Monaco and Carl Chenet; (ii) Jennifer Parkhurst; and (iii) Ronald Medalla.  (Weinberg Dep. at 217:7 – 218:7; Monaco Dec., ¶ 12.)

8

62.    Jennifer Parkhurst recommended Brian Burke over Plaintiff for the promotion to FR3.  (Monaco Dec., ¶ 12, Exh. 5.)

63.    Ronald Medalla recommended Brian Burke over Plaintiff for the promotion to FR3.  (Monaco Dec., ¶ 12, Exh. 6.)

64.    Ed Monaco concurred with Jennifer Parkhurst and Ronald Medalla that Brian Burke performed better than Plaintiff in the job interviews and was the best candidate for the FR3 position.  (Monaco Dec., ¶ 12.)

65.    Plaintiff's religion was not a factor in Jennifer Parkhurst's decision to recommend Brian Burke over Plaintiff for the FR3 position.  (Weinberg Dep. at 219:3-6.)

66.    Plaintiff's religion was not a factor in Ronald Medalla's decision to recommend Brian Burke over Plaintiff for the FR3 position.  (Weinberg Dep. at 218:23 – 219:2.)

67.    Plaintiff does not know whether Jennifer Parkhurst was aware of his complaints against Ed Monaco at the time she recommended Brian Burke for the promotion to FR3. (Weinberg Dep. at 218:18-22.)

68.    Plaintiff does not know whether Ronald Medalla was aware of his complaints against Ed Monaco at the time he recommended Brian Burke for the promotion to FR3. (Weinberg Dep. at 218:18-22.)

69.    Robert Strack, a non-Jewish employee who never complained about Ed Monaco, had the same tenure and experience as an FR2 as Plaintiff and a longer tenure at Fidelity than Plaintiff, but was not promoted to FR3 by Monaco.  (Weinberg Dep. at 219:23 – 220:6; Monaco Dec., ¶ 13.)

70.    The following non-Jewish, non-complaining employees who worked in the Rockefeller Center branch as FR2s during Ed Monaco's tenure as Branch Manager were not

9

promoted to FR3 by Monaco: Robert Strack, Nathanial Ladde, Shannon Barrett, Rodney Alvarado, Andrea Quagenti, Michael Selvitella, and Alex Scarborough. (Monaco Dec., ¶ 13.)

71.     Plaintiff did not believe he needed any additional training to be eligible for promotion to FR3. (Weinberg Dep. at 185:3-11.)

72.     Fidelity Wholesalers were present in the Rockefeller Center branch and available to train Plaintiff and other employees at least once a month. (Weinberg Dep. at 152:17 – 155:5.)

73.     Plaintiff was never denied training that he requested by a Fidelity Wholesaler. (Weinberg Dep. at 154:16-18.)

74.     Plaintiff believes that he knew how to use the Retirement Income Planning ("RIP") tool. (Weinberg Dep. at 133:3-5.)

75.     In 2004, Plaintiff received assistance developing his RIP skills from one of Fidelity's Planning and Guidance Specialists, Dan Fitzgerald. (Weinberg Dep. at 134:16 – 135:23.)

76.     Plaintiff does not recall ever approaching Ed Monaco about getting help with his RIP skills. (Weinberg Dep. at 135:24 – 136:2; 232:15-21.)

77.     Ed Monaco expressly asked Fidelity's training department to schedule Plaintiff for RIP training in May 2005, and made a follow-up request in August 2005. (Monaco Dec., ¶ 15, Exh. 8.)

78.     Plaintiff did not feel that he needed any additional RIP training at the time he applied for the promotion to FR3 in 2005. (Weinberg Dep. at 229:24 – 230:14.)

79.     Plaintiff felt thoroughly proficient in Portfolio Advisor Services ("PAS") skills as of 2004. (Weinberg Dep. at 137:20 – 138:9.)

80.     Plaintiff was never denied training in PAS skills. (Weinberg Dep. at 138:7-15.)

81.     Plaintiff was provided with the following training along with his colleagues: (i) Investor Profile Questionnaire ("IPQ") training; (ii) Portfolio Investment Review ("PIR") training; (iii) Portfolio Advisory Services ("PAS") training; (iv) Mutual Fund training; (v) Trader training; and (vi) Estate Planning training.  (Weinberg Dep. at 154:16-18, 367:23 – 368:25, 509:12 – 511:7, 515:13 – 522:16, Exh. 78; Monaco Dec., ¶ 14, Exh. 7.)

82.     Plaintiff was offered Financial Planning Consultant ("FPC") training in 2005, but never attended because he resigned.  (Weinberg Dep. at 233:6 – 235:5.)

83.     Plaintiff does not recall Ed Monaco ever denying one of his requests for training. (Weinberg Dep. at 513:4-22.)

84.     In January 2004, Plaintiff met with Ed Monaco, stated that he felt Monaco was being "standoffish," and asked the following questions: "Is it because you don't like me?  Is it how I dress?  Is it how I look?  Or is it because I'm Jewish?"  (Weinberg Dep. at 282:10 – 283:17, 287:23 – 288:23.)

85.     On January 10, 2005, Ed Monaco, in consultation with Fidelity's human resources department, placed Plaintiff on a written performance warning for a period of 60 days, and provided Plaintiff with a copy of the performance warning document marked and identified as Exhibit 45 to Plaintiff's deposition.  (Weinberg Dep. at 347:18-22, Exh. 45.)

86.     Ed Monaco did not issue any performance warnings to Plaintiff prior to January 2005.  (Weinberg Dep. at 333:12-19.)

87.     In the January 10, 2005 performance warning, Ed Monaco stated that Plaintiff had taken in unacceptable checks from customers on two separate occasions.  (Weinberg Dep. at 347:18-22, Exh. 45.)  Plaintiff admits that he committed those errors.  (Id. at 149:20 – 150:22, 352:8 – 353:15, 355:23 – 359:18, Exhs. 46, 47.)

11

88.    Accepting checks from clients that are not in good order can negatively effect the Rockefeller Center branch's "Customer Experience Index." (Weinberg Dep. at 149:20 – 150:22.)

89.    In the January 10, 2005 performance warning, Ed Monaco stated that Plaintiff had taken in a wire form from a client when "the money was not available to be wired out," and that the client "was extremely dissatisfied with the service provided." (Weinberg Dep. at 347:18-22, Exh. 45.)  Plaintiff admits that he committed this error.  (Id. at 351:7 – 352:4.)

90.    On January 14, 2005, Plaintiff sent to Fidelity's human resources department the e-mail marked and identified as Exhibit 27 to his deposition. (Weinberg Dep. at 235:16-20, Exh. 27.)

91.    In Plaintiff's January 14, 2005 e-mail to human resources, he was attempting to show that the January 10, 2005 written performance warning was unwarranted. (Weinberg Dep. at 236:10-13.)

92.    In Plaintiff's January 14, 2005 e-mail to human resources, he was attempting to provide evidence that Ed Monaco was treating him unfairly. (Weinberg Dep. at 236:14-17.)

93.    On January 24, 2005, Plaintiff sent to Fidelity's Vice President of Employee Relations, David Johnson, the e-mail marked and identified as Exhibit 28 to Plaintiff's deposition. (Weinberg Dep. at 238:18-24, 384:16-22, Exh. 28.)

94.    It took Plaintiff "a day or so" to write the January 24, 2005 e-mail to David Johnson. (Weinberg Dep. at 238:25 – 239:3.)

95.    Plaintiff "put a lot of thought" into his January 24, 2005 e-mail to David Johnson. (Weinberg Dep. at 239:4-6.)

96.     In Plaintiff's January 24, 2005 e-mail to David Johnson, Plaintiff was attempting to explain why he thought Ed Monaco was treating him unfairly.  (Weinberg Dep. at 239:7-16.)

97.     On March 11, 2005, Ed Monaco, in consultation with Fidelity's human resources department, extended Plaintiff's performance warning period for 30 days, and provided Plaintiff with a copy of the performance warning extension document marked and identified as Exhibit 58 to Plaintiff's deposition.  (Weinberg Dep. at 454:10 – 455:11, Exh. 58.)

98.     On April 15, 2005, Ed Monaco, in consultation with Fidelity's human resources department, extended Plaintiff's performance warning for 60 days, and provided Plaintiff with a copy of the performance warning extension document marked and identified as Exhibit 59 to Plaintiff's deposition.  (Weinberg Dep. at 457:14 – 459:10, Exh. 59.)

99.     In the April 15, 2005 performance warning extension, Ed Monaco stated that Plaintiff had mailed the results of a portfolio analyses to a client at an overseas address, in violation of Fidelity policy.  (Weinberg Dep. at 457:14-20, Exh. 59.)  Plaintiff admits that he committed this error.  (Id. at 470:7-18.)

100.    As a result of Plaintiff's policy violation, Ted Riordan of Fidelity's compliance department directed that Plaintiff be placed on "heightened observation," which entailed one additional client interaction observation per quarter for the next two quarters.  (Weinberg Dep. at 457:14-20, 471:19 – 472:13, Exh. 59.)

101.    Plaintiff has no evidence that Ted Riordan was aware of his complaints against Ed Monaco at the time he recommended placing Plaintiff on heightened observation.  (Weinberg Dep. at 470:4-6.)

102.    In the April 15, 2005 performance warning extension, Ed Monaco stated that a client had complained that Plaintiff failed to advise him that Fidelity's fee for a wire transaction

would be automatically deducted from the amount wired. (Weinberg Dep. at 457:14-20, Exh. 59.) As a result, the client almost lost an investment opportunity because of insufficient funds. (Id.) Plaintiff admits handling that transaction, acknowledges that the customer complained, and concedes that Monaco discussed it with him at the time. (Id. at 478:7-19, 479:11-20, 480:7 – 481:10, Exh. 66.)

103.    On June 23, 2005, Ed Monaco concluded Plaintiff's performance warning period and removed him from warning status. (Weinberg Dep. at 482:15 – 485:2, Exh. 67.)

104.    As of June 23, 2005, Plaintiff understood that he was no longer on written warning status and that his overall performance was now considered satisfactory. (Weinberg Dep. at 484:19 – 485:2.)

105.    Plaintiff thought it was "nice" to be off written warning status. (Weinberg Dep. at 485:15-21.)

106.    Plaintiff resigned his employment at Fidelity on January 6, 2006. (Weinberg Dep. at 524:22 – 525:12, Exh. 79.)

107.    Plaintiff gave Fidelity no reason for his resignation. (Weinberg Dep. at 526:18 – 527:4.)

108.    Plaintiff never asked to be transferred to a different branch at Fidelity. (Weinberg Dep. at 534:16-18.)

109.    The next business day after resigning from Fidelity, Plaintiff commenced employment at HSBC in a higher-level, higher-paying position with better benefits. (Weinberg Dep. at 534:23 – 538:1.)

110.    In 2004, Plaintiff was ranked 11th out of 14 Rockefeller Center financial representatives in number of customer referrals, and was ranked next to last in referrals among

Rockefeller Center financial representatives at his level. (Weinberg Dep. at 363:7-11: 363:24 – 366:20, Exh. 48; Monaco Dec., ¶ 11, Exh. 4.)

111.    Fidelity's on-line learning center examinations test basic product knowledge; they are unsupervised and employees are permitted to consult reference materials while taking them; and employees can take them an unlimited number of times until they pass. (Weinberg Dep. at 367:3-14, 368:16-21; Monaco Dep. at 259:23 – 260:6; Monaco Dec., ¶ 10.)

112.    In January 2005, a Fidelity Mutual Fund Mutual Fund Wholesaler, Charles Garabedian, informed Ed Monaco that Plaintiff was the only financial representative at his level to get a failing grade on his knowledge of Fidelity's asset allocation strategies. (Monaco Dec., ¶ 10, Exh. 3.)

113.    From approximately April 2004 through January 10, 2005, Plaintiff was assigned to a cubicle in the operations area on the first floor of the Rockefeller Center branch. (Weinberg Dep. at 301:5-21, 305:7-12, 314:19 – 315:23, Exh. 33.)

114.    Prior to being assigned to a cubicle in the operations area, Plaintiff worked in a cubicle on the second floor of the branch. (Weinberg Dep. at 296:19 – 297:12, 298:18-22.)

115.    Plaintiff did not object to being assigned to a cubicle in the operations area. (Weinberg Dep. at 306:15-17.)

116.    Plaintiff did not complain about being moved to a cubicle in the operations area. (Weinberg Dep. at 306:18-24.)

117.    Other employees had cubicles in the operations area, including the Operations Manager, Pat Ragosta. (Weinberg Dep. at 299:2-25.)

118.    Most of the financial representatives at Plaintiff's level worked on the first floor of the branch, which was in closer proximity to the customer counter that Plaintiff and his

colleagues manned during the day.  (Weinberg Dep. at 34:20-25, 40:5-9; Monaco Dep. at 220:21
– 221:6, 345:23 – 346:11.)

119.    Plaintiff's cubicle in the operations area was directly adjacent to and connected
with the cubicle of the branch Operations Manager.  (Weinberg Dep. at 300:16-24, 302:14-18,
Exh. 34.)

120.    There was no garbage receptacle within sight of Plaintiff's cubicle in the
operations area.  (Weinberg Dep. at 302:14 – 305:6, Exhs. 34, 35.)

121.    Plaintiff's cubicle in the operations area had a working computer.  (Weinberg
Dep. at 307:19-21.)

122.    Plaintiff's cubicle in the operations area had a working telephone from which
Plaintiff was able to make calls, and from which he could receive calls via voicemail.  (Weinberg
Dep. at 307:22 – 308:4.)

123.    Plaintiff told Fidelity human resources that he was still able to perform and excel
at his job while working in the cubicle in the operations area.  (Weinberg Dep. at 312:8 – 313:16,
Exh. 27.)

124.    On January 10, 2005, Plaintiff asked Ed Monaco for the first time if he could be
moved back to a second floor cubicle, and Monaco agreed.  (Weinberg Dep. at 314:19 – 315:23.)

125.    Shortly after Plaintiff was moved back to a second floor cubicle, Ed Monaco
assigned a non-Jewish, non-complaining employee holding the same position as Plaintiff to
Plaintiff's former cubicle in the operations area.  (Monaco Dep. at 353:23 – 354:6.)

126.    Dana Mallardi, not Ed Monaco, scheduled a team dinner for September 16, 2004.
(Declaration of Dana Mallardi dated November 1, 2006 ("Mallardi Dec."), ¶¶ 3-5, Exh. 1;
Weinberg Dep. at 321:10-17.)

16

127.    Dana Mallardi did not intentionally schedule the team dinner on a Jewish holiday. (Mallardi Dec., ¶¶ 4-5; Weinberg Dep. at 322:10-17.)

128.    No team outings were scheduled on Jewish holidays at any time either prior or subsequent to September 16, 2004. (Weinberg Dep. at 324:8-10.)

129.    During the time Plaintiff was employed by Fidelity, the first two weeks of April were the busiest time of year at the Rockefeller Center branch. (Weinberg Dep. at 326:13-23.)

130.    Plaintiff asked Ed Monaco if he could attend a doctor's appointment in the middle of the day on April 6, 2005. (Weinberg Dep. at 324:24 – 325:8, Exh. 38.)

131.    Ed Monaco asked Plaintiff if it would be possible for him the reschedule the appointment for after April 15th. (Weinberg Dep. at 324:24 – 325:8, Exh. 38.)

132.    Plaintiff agreed to reschedule the appointment for after working hours. (Weinberg Dep. at 324:24 – 325:8, Exh. 38.)

133.    Plaintiff does not know whether Ed Monaco ever denied non-Jewish employees' requests for time off during the first two weeks of April. (Weinberg Dep. at 329:20-24.)

134.    With the exception of this one occasion, Ed Monaco routinely granted Plaintiff's requests for time off both prior and subsequent to April 2005. (Weinberg Dep. at 330:8 – 333:6, Exhs. 39, 40, 41; Monaco Dec., ¶ 17, Exh. 11.)

135.    The amount of the semi-annual bonus provided to FR2s at the Rockefeller Center branch was based in part on the Branch Manager's assessment of their individual job performance. (Monaco Dec., ¶ 18.)

136.    Steven Epstein was a customer service representative ("CSR") employed by Fidelity. (Weinberg Dep. at 247:23 – 248:2.)

137.    CSRs process operational paperwork. (Weinberg Dep. at 248:8-9.)

138.    CSR is a lower level position than FR2.  (Weinberg Dep. at 248:5-7.)

139.    Steven Epstein was not a registered securities representative and had no NASD licenses.  (Weinberg Dep. at 248:10-14.)

140.    Steven Epstein reported directly to the branch operations manager, Pat Ragosta. (Weinberg Dep. at 248:15-20.)

141.    Plaintiff has no personal knowledge as to why Steven Epstein was discharged. (Weinberg Dep. at 251:4-6.)

142.    Plaintiff does not know who recommended that Steven Epstein be discharged. (Weinberg Dep. at 251:12-14.)

143.    Fidelity's human resources department determined that Plaintiff's claims that Ed Monaco discriminated against him because of his religion and retaliated against him were without merit.  (Deposition of David F. Johnson dated September 14, 2006 ("Johnson Dep.") at 143:1 – 145:19, 155:9-18.)

144.    In April 2005, Plaintiff filed a charge with the EEOC alleging religious discrimination and retaliation by Fidelity and Ed Monaco. (Weinberg Dep. at 58:22 – 59:7, Exh. 9.)

145.    The EEOC found no evidence to support Plaintiff's claims.  (Pappas Dec., ¶ 3, Exh. 2.)

Dated: November 3, 2006
       New York, New York

LITTLER MENDELSON, P.C.

Attorneys for Defendants

By:    ___S/_____
       Michael P. Pappas. (MP-6716)

18